UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:26-CR-00060-1-DCLC-CRW |
| | ) | |
| JAMES W. BRINKLEY, IV | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant James W. Brinkley, IV's Motion for Revocation of Detention Order and Motion for Release under Appropriate Conditions [Doc. 47]. For the reasons below, the Court will deny Mr. Brinkley's motion.[1]

## I. BACKGROUND

In June 2026, the United States brought a one-count criminal complaint against Mr. Brinkley, alleging that he violated § 2252A(a)(5)(B), knowingly possessing or accessing with the intent to view child pornography. Eric Hilton, an investigator with the Johnson City Police Department, submitted an affidavit setting out the following facts:

> 3. On April I, 2026, I began an investigation into five Cyber tips (CT) received from the National Center for Missing and Exploited Children (NCMEC) and assigned by the ICAC commander in Knoxville, TN. The tip numbers are: 231215440, 231228428, 231265573, 231248985, and 231201082. Between all five tips, over 400 videos had been reported for content involving child sexual assault material (CSAM).
>
> 4. The tips were reported to NCMEC from Google LLC. Google reported that a user with the name of J B, a mobile phone number of 1(423) 943-8408, and an email address was provided. The account user with the email of jameswbrinkleyIV@gmail.com uploaded child pornography to Google Photos. Google classified 400 videos that were uploaded to Google Photos as CSAM. The

[1] Mr. Brinkley requests a hearing on his motion. [Def.'s Mot. to Revoke, Doc. 47, at 1]. A second hearing is not required on a motion for revocation under § 3145(b), however, particularly where "the material information is already in the record from the initial detention hearing." *United States v. Walden*, No. 3:24-CR-19, 2024 WL 2121232, at *1 (E.D. Tenn. May 10, 2024) (citation omitted). The Court may decide the motion on the existing record if it permits an independent assessment of the disputed issues and the available conditions of release. Having reviewed the record, the Court finds that a second hearing is unnecessary. His request for a hearing is therefore **DENIED**.

date range of the child sexual assault material (CSAM) uploads was from December 14, 2025 through March 2, 2026. The same personal identifiers and account information were on all five tips. The user uploaded the CSAM files by using IP address 75.136.200.225.

5. Your affiant submitted a subpoena to Charter Communications for subscriber information related to the IP address of 75.136.200.225 used for the internet connection. On April 3, 2026, Charter provided a return containing the subscriber information. The name registered on the account was James Brinkley. The address listed for the service was Woodbriar Drive, Johnson City, Tennessee 37604 1 and the registered phone number was (423) 948-8408.

6. The CTs listed the following Gmail account as containing CSAM in Google Photos: jamesbrinkleyIV@gmail.com. Your affiant applied for a search warrant for jamesbrinkleyIV@gmail.com. I received a return from Google on May 22, 2026. The search warrant included the contents of Google Photos. I examined the more than 400 videos contained in Google Photos. Based on my training and experience, the videos contained CSAM.

7. Specifically, in my review, your affiant observed both prepubescent and pubescent males. The approximate ages of the males range from four years old to 17 years old. Content in the more than 400 videos showed males, under the age of 18, masturbating, performing oral sex on other males under the age of 18, engaging in anal sex, and mutual masturbation. In at least three videos, a prepubescent male would be engaged in anal and oral sex with males over the age of 18.

8. In addition to the CSAM contained in the Google Photos account, your affiant observed photos depicting both the defendant and other individuals known to associate with him. These photos were positively identified by using the department's records management system, WATSON, to search for DMV records for BRJNKLEY. Officers of the Johnson City Police Department contacted BRINKLEY on September 12, 2025 during a traffic stop. BRINKLEY was driving a 2017 black Mercedes Benz registered to him. During this interaction, BRINKLEY received a traffic citation for speeding. This citation (stored in the WATSON records management system) included his driver's license picture.

[Compl., Doc. 3, at 1–3].

Mr. Brinkley moved for a detention hearing under 18 U.S.C. § 3142(f) and for a preliminary hearing under Federal Rule of Criminal Procedure 5.1. In response to his motion, United States Magistrate Judge Cynthia R. Wyrick held a preliminary hearing[2] and a detention

[2] In the weeks following the filing of the criminal complaint, a federal grand jury indicted Mr. Brinkley on one count of violating § 2252A(a)(5)(B), [Indictment, Doc. 37], obviating the need for this Court to address the

hearing. Investigator Hilton appeared as a witness for the United States, and his testimony overlapped with his sworn statements in the criminal complaint. Mr. Brinkley then called his own witness, Lora Baumgardner, a friend and neighbor of Mr. Brinkley, and Mr. Brinkley's mother. Ms. Baumgardner testified that Mr. Brinkley's mother could serve as a third-party custodian[3] over Mr. Brinkley if Magistrate Judge Wyrick were to order Mr. Brinkley's release. [Order of Det., Doc. 41, at 8].

Mr. Brinkley's mother is eighty-four years of age, lives in a six-bedroom home, and proposes that Mr. Brinkley reside there with her pending his trial. [Ms. Brinkley Decl., Doc. 14, at 19, 21–22]. As part of her proposal to serve as Mr. Brinkley's third-party custodian, she intends to "cancel her home internet," but she will continue to have access to the internet via her cellphone's hotspot, which has a protected passcode. [*Id.* at 22]. She cannot forego access to the hotspot because she needs the internet to manage her business. [*Id.* at 21]. According to Ms. Baumgardner, Ms. Brinkley is a "dynamic and tenacious woman" and would suitably serve as a third-party custodian over Mr. Brinkley if Magistrate Judge Wyrick were to order Mr. Brinkley's release. [Order of Det., Doc. 41, at 8]. Ms. Baumgardner testified that she works from home, "lives close by," is "very technology savvy," and "would be more than willing" to help Ms. Brinkley in ensuring that Mr. Brinkley abides by all conditions of release. [Hr'g Tr., Doc. 41, at 49:2–4, No. 2:26-mj-00112-1-CRW]. In addition, Mr. Brinkley proffered two letters

---

whether there was probable cause that Mr. Brinkley violated § 2252A(a)(5)(B). *See* Fed. R. Crim. P. 5.1(a)(2) ("If a defendant is charged with an offense other than a petty offense, a magistrate judge must conduct a preliminary hearing unless . . . . the defendant is indicted[.]"). And in any case, Mr. Brinkley does not expressly challenge the probable-cause determination.

[3] Section 3142(c)(1)(B)(i) states that a judicial officer may order, as a condition of pretrial release, that a defendant "remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community[.]"

for Magistrate Judge Wyrick's consideration, both of which are from his in-laws, who express their confidence that Mr. Brinkley, if released, would comply with all conditions of release and state that they will assist in ensuring that he does so. [Bethany Smile Letter, Doc. 31-1, at 1–2; Ellen Smile Letter, Doc. 31-2, at 1].

After taking the parties' evidence and arguments under advisement, Magistrate Judge Wyrick issued a written opinion in which she ordered Mr. Brinkley's detention pending trial. She concluded that the United States "provided the court with clear and convincing evidence that Defendant would present a serious danger to the community if released, and that no condition, or combination of conditions, of release can be imposed which would reasonably assure the community's safety." [Order of Det., Doc. 41, at 11].[4] Under 18 U.S.C. § 3145(b),[5] Mr. Brinkley now seeks this Court's review of Magistrate Judge Wyrick's order detaining him pending trial and moves this Court to revoke it. The United States has responded in opposition to Mr. Brinkley's motion. [United States's Resp., Doc. 50].

## II. Legal Standard

Pretrial detention is permissible only when "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e(1). The Act requires reasonable assurance, rather than a guarantee, of appearance and safety of the community. A

---

[4] Magistrate Judge Wyrick's order contains inconsistent conclusions concerning risk of flight. *Compare* [Order of Det., Doc. 41, pg. 10] ("the United States failed to satisfy the preponderance of the evidence standard as to risk of flight") *with id.* at 12]("the United States has met its burden of showing by clear and convincing evidence that Defendant presents a serious risk of flight."_ The Court does not rely on risk of flight as a ground for detention but on the evidence of the danger he poses to the community is by itself sufficient to warrant his detention pending trial.

[5] Section 3145(b) authorizes this Court to revoke or amend the magistrate judge's detention order and requires prompt determination of the motion. The Court exercises that authority here.

defendant detained by a magistrate judge may seek revocation or amendment of the detention order in the court having original jurisdiction over the offense. 18 U.S.C. § 3145(b).

A district court reviews a magistrate judge's detention order de novo, making an independent determination of the proper pretrial detention or conditions for release. *See United States v. Yamini*, 91 F. Supp. 2d 1125, 1128-29 (S.D. Ohio 2000); *United States v. Brooks*, 685 F. Supp. 3d 476, 479 (E.D. Mich. 2023). The Court considers the evidence presented at the detention hearing, the parties' submissions, and the pretrial services report. While the Court "need not defer to the magistrate judge's ultimate conclusion nor start from scratch," it "must engage in some independent review of the decision." *Brooks*, 685 F. Supp 3d at 479 (citation omitted). The United States has the burden of establishing, by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of any other person and the community. 18 U.S.C. § 3142(f); *United States v. Stone*, 608 F.3d 939, 946 (6th Cir. 2010). That burden remains with the United States throughout the Court's review.

## III. Analysis

In determining whether the United States has met its burden, the Court considers four factors: (1) the nature and circumstances of the offense charged, including whether the offense is "a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device," (2) the weight of the evidence against the defendant, (3) the defendant's history and characteristics, and (4) the nature and seriousness of the danger that the defendant's release would present to any person or the public. 18 U.S.C. § 3142(g)(1)–(4). The Court "has broad discretion to determine how much weight to assign the factors listed in § 3142(g) based on the circumstances of a particular case." *United States v. Abrego*, 787 F. Supp. 3d 830, 842 (M.D. Tenn. 2025) (citing *United*

*States v. Zhang*, 55 F.4th 141, 149–50 (2d Cir. 2022)). The charge against Mr. Brinkley—knowingly possessing or accessing with the intent to view child pornography, in violation of § 2252A(a)(5)(B)—is not one that carries with it a presumption of detention. *See* 18 U.S.C. § 3142(e)(3)(E).

**1. Section 3142(g)(1): The Nature and Circumstances of the Offense Charged**

The nature of Mr. Brinkley's charge favors detention. Under § 3142(g)(1), whether the offense charged "involves a minor victim" is a specific consideration, 18 U.S.C. § 3142(g)(1), and § 2252A(a)(5)(B) proscribes conduct involving minors, *see* 18 U.S.C. § 2256(8) (defining "child pornography" as images of minors engaged in sexually explicit conduct). Also, the Sixth Circuit has recognized that a charge of knowingly possessing or accessing with the intent to view child pornography under § 2252A(a)(5)(B) is unequivocally serious in nature. *See United States v. Robinson*, 669 F.3d 767, 776 (6th Cir. 2012) (asserting that "[c]hild pornography is, without qualification, a serious crime"). And notably, § 2252A(a)(5)(B) carries a maximum term of ten years' imprisonment, increased to twenty years if the offense involves a prepubescent minor or a minor younger than twelve. Investigator Hilton described videos depicting prepubescent children. 18 U.S.C. § 2252A(b)(2). These lengthy statutory terms of imprisonment that can accompany a conviction under § 2252A(a)(5)(B) reflect the seriousness of the offense Mr. Brinkley is facing . *See United States v. Dixon*, No. 20-1998, 2021 WL 1502723, at *1 (6th Cir. Mar. 22, 2021) (affirming the detention of the defendant and agreeing with the district court's view that a possible ten-year term of incarceration "reflected the seriousness of the crime").

The circumstances of the alleged offense also weigh in favor of detention. Magistrate Judge Wyrick cited evidence that Mr. Brinkley possessed child pornography over an extended period of time, undetected by family and friends. [Order of Det., Doc. 41, at 10]. This extended

possession is indicative of dangerousness to the community because it "reflect[s] behavior that is not isolated but recurring and persistent," *United States v. Goeglein*, No. 3:26-CR-19-TAV-DCP, 2026 WL 2030814, at *7 (E.D. Tenn. July 14, 2026). The alleged collection also contains more than 400 videos, including videos depicting the sexual abuse of prepubescent children. [Order of Det., Doc. 41, at 10]. The volume and content of these videos reinforces the concern that the conduct would continue if Mr. Brinkley had access to similar material while on release. *See United States v. King*, No. 3:22-CR-60-TAV-DCP-1, 2022 WL 3645996, at *4 (E.D. Tenn. Aug. 24, 2022). These circumstances support a finding of dangerousness, but the Court must still consider whether conditions could reasonably address that danger.

Mr. Brinkley argues that possession is "less serious than related offenses" involving production, distribution or actual contact with a child. [Def.'s Mot. to Revoke, Doc. 47, at 8]. That distinction is relevant to the nature and circumstances of the offense, but it does not lessen the severity of the conduct Mr. Brinkley stands accused of. "Child pornography is, without qualification, a serious crime." *Robinson*, 669 F.3d at 776. Possession of this material contributes to the continuing harm suffered by the children depicted. *See also Paroline v. United States*, 572 U.S. 434, 457 (2014). The Court's concern focuses on the volume and content of the collection and the evidence that Mr. Brinkley possessed this material for an extended period of time.

Mr. Brinkley also argues that the alleged images of child pornography "might be real but they might also could be fictitious depictions . . . . generated by Artificial Intelligence,"[6] and that the absence of a forensic examination of the images requires the Court to conclude that the offense

[6] In *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 256-57 (2002), the Supreme Court invalidated two provisions of the Child Pornography Prevention Act of 1996 ("CCPA") that expanded the definition of child pornography to cover certain visual depictions. That decision does not establish that the videos at issue in this case are artificially generated.

does not involve a "minor victim" under § 3142(g)(1).[7] [Def.'s Mot. to Revoke, Doc. 47, at 7–8]. The Court must assess that contention in evaluating the evidence supporting detention.

Investigator Hilton personally reviewed the videos and described the depicted children, their approximate ages, and the sexual conduct shown in the videos. [Compl., Doc. 3, ¶¶ 6-7]. The Court gives that firsthand review of the material substantial weight at this stage in the case. The mere possibility that an image could be artificially generated does not, without more, require the Court to disregard the investigator's own personal observations. For all these reasons, the nature and circumstances of Mr. Brinkley's charged offense favor detention.

**2. Section 3142(g)(2): The Weight of the Evidence**

Next, as to the second factor under § 3142(g)(2), the weight of the evidence—which "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt," *Stone*, 608 F.3d at 948 (citation omitted)—likewise favors detention. This factor is "somewhat duplicative of § 3142(g)(1) because, "in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history." *Goeglein*, 2026 WL 2030814 at *6 (quoting *United States v. Burn*, No. 5:26-CR-2, 2026 WL 411732, at *5 (E.D. Ky. Feb. 9, 2026)).

Mr. Brinkley's criminal history is negligible, consisting of a pair of traffic violations, [Pretrial Servs. Rep. at 3 (on file with the Court)]. That favorable history deserves weight. It does not eliminate the concern arising from the alleged volume and content of the images and the evidence of possession over an extended time period. Those circumstances bear on the risk of dangerousness during release and weigh in favor of detention under § 3142(g)(2).

[7] The Bail Reform Act does not define the term "minor victim."

Mr. Brinkley's arguments to the contrary do not convince the Court otherwise. First, Mr. Brinkley contends that Magistrate Judge Wyrick, in evaluating the weight of the evidence under § 3142(g)(2), erred by "address[ing] [her] view of Mr. Brinkley's *guilt*, *not* his future *dangerousness* if released," [Def.'s Mot. to Revoke, Doc. 47, at 10 (emphasis in original)], and in support of this contention, he highlights language from her order:

> Specifically, in evaluating the weight of the evidence against Defendant, the Court notes the volume and specific content of the CSAM found on the micro-SD card and hard drive in Defendant's home, and the other evidence contained on those devices clearly tying them to Defendant. Further, the Government was able to connect Defendant's email and IP addresses, and his home address and telephone number to CSAM, and Defendant admitted to using the email address at issue. Additionally, the presence of a video containing a victim with a likeness so similar to Defendant's stepson, particularly in light of Defendant's Google search history, adds to the seriousness of the potential harm to the community. **In short, the evidence against Defendant is strong.**

[*Id.* (emphasis in original) (quoting [Order of Det., Doc. 41, at 11])]. Evidence linking the account and devices to Mr. Brinkley is relevant to whether the alleged conduct can reliably be attributed to him. The strength of the Government's case is not itself the reason for detention. The Court must consider the alleged volume and content of the collection and the evidence of extended possession because they all bear on the risk of Mr. Brinkley remaining a danger during release. The Court's assessment under § 3142(g)(2) directly addresses that risk, not the determination of guilt. This evidence—the evidence of the quantity of the images, the content, and length of time of possession—goes to the weight of the evidence of Mr. Brinkley's dangerousness, not his guilt.

Mr. Brinkley also argues that Magistrate Judge Wyrick's "findings overstate the evidence presented against Mr. Brinkley at the hearing," [Def.'s Mot. to revoke, Doc. 47, at 10], because Investigator Hilton's testimony was "largely summary hearsay," [*id.* at 11]. But the Sixth Circuit has recognized that "the government may proceed in a detention hearing by proffer or hearsay," *Stone*, 608 F.3d at 949 (quotation omitted); *see* 18 U.S.C. § 3142(f) ("The rules concerning

admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . whether to release on bail or otherwise."), so Mr. Brinkley's contention that Investigator Hilton's testimony was hearsay is not, by itself, a basis to disturb Magistrate Judge Wyrick's detention order. And apart from complaining of hearsay, Mr. Brinkley makes no other argument against Investigator Hilton's reliability. *See United States v. Robinson,* No. 1:07-CR-1, 2007 U.S. Dist. LEXIS 53290 E.D. Tenn. July 23, 2007) ("Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his *de novo* review of the record he finds a reason to question the magistrate judge's assessment."); *see also United States v. Sutton*, 38 F. App'x 508, 511 (6th Cir. 2010) (stating that a magistrate judge's "credibility determination will only be set aside if it is clearly erroneous"). The Court credits the firsthand description of the videos for purposes of reviewing the detention order.

And lastly, although Mr. Brinkley also argues against detention because it will "be extended significantly" while his attorney awaits a forensic review of the electronic devices that law enforcement seized from his home, [Def.'s Mot. to Revoke, Doc. 47, at 12], any potential for a prolonged period of detention is harm that does not outweigh the danger to the community from his release. *See Fox*, 2017 WL 11546291 at *2 ("Certainly, [the defendant] will suffer some harm from his detention. But that harm does not outweigh the danger to the public from his release." (citing *United States v. Salerno*, 481 U.S. 739, 748 (1987)). The prospect of further delay does not, by itself, require release, though detention that becomes excessively prolonged may raise due process concerns. *Salerno*, 481 U.S. at 747 n.4. On the record before the Court,

the anticipated time to conduct the forensic review is uncertain and thus cannot establish that the continued detention of Mr. Brinkley will be excessive.

**3. Section 3142(g)(3): History and Characteristics**

As to the third factor under § 3142(g)(3), Mr. Brinkley's history and characteristics neither favor nor disfavor his release. The Court considers Mr. Brinkley's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3). While Mr. Brinkley points out that Magistrate Judge Wyrick's "order of detention does not describe [her] findings about Mr. Brinkley's personal history and characteristics," [Order of Det., Doc. 41, at 12], the Court can and will give its own consideration to his history and characteristics now. *See Raddatz*, 447 U.S. at 675 (acknowledging that a de novo review requires "fresh consideration" of the issues (quotation omitted)); *see also* 28 U.S.C. § 636(b)(1) (permitting the district court to modify the report and recommendation).

Mr. Brinkley is fifty-seven years old and has lived in East Tennessee for twenty years. [Pretrial Servs. Rep. at 1]. During the last four years, he has resided with his husband, Faysal Smile II, and Mr. Smile's ten-year-old son, Faysal Smile III, in Johnson City, Tennessee. [*Id.* at 1–2]. His mother also resides in Johnson City. [*Id.* at 2]. He holds a bachelor's degree from the University of Tennessee and is employed. [*Id.*]. Last year, he underwent surgery for a right hip replacement, and next year, he will undergo surgery for a left hip replacement. [*Id.*]. Apart from high blood pressure and unidentified "other medical issues," he appears to be in reasonably good physical health. [*Id.*]. He suffers from no mental-health problems and has no history of substance abuse. [*Id.*]. And again, he has no significant criminal history.

Mr. Brinkley's employment, longstanding community ties, family support, and lack of significant criminal history weigh in favor of release. The Court gives those factors meaningful weight. The evidence of sustained possession of child pornography also bears on his past conduct, which the Court has already addressed. His favorable personal history does not eliminate the concern the Court has expressed concerning his past conduct. It does require careful consideration of whether appropriate restrictions and supervision would reasonably assure the safety of the community.

**4. Section 3142(g)(4): Nature and Seriousness of the Danger Posed by Release**

As to the fourth and final factor under § 3142(g)(4), the nature and seriousness of the danger that Mr. Brinkley's release would pose to the community favors detention. The danger at issue here is the risk of Mr. Brinkley continuing to acquire and possess material depicting the sexual abuse of children and the resulting harm to the children so depicted. The Court must also consider the evidence concerning Mr. Brinkley's stepson, while recognizing the limits of that evidence.

Investigator Hilton testified that while reviewing the 400 videos that he recovered from the Google account, he "observed a child in one of the videos who had a striking similarity" to the minor stepson. [Hr'g Tr., Doc. 39, at 36:2–4, No. 2:26-mj-00112-1-CRW]. In this vein, Magistrate Judge Wyrick, in her opinion, stated that "[a] clip from the video of the child's face along with an image of Defendant's stepson were entered into evidence and the Court was able to personally observe the similarity." [Order of Det., Doc. 41, at 4 n.5]. Investigator Hilton also testified that he discovered two searches that were performed from the Google account: "movie where drunk dad goes into son's room" and "movie where drunk dad goes into son's room and tries to assault him." [Hr'g Tr., Doc. 39, at 40:21–22, 40:25, 41:1, No. 2:26-mj-00112-1-CRW].

Although Investigator Hilton testified that the stepson did not disclose that Mr. Brinkley had sexually abused him. [Hr'g Tr., Doc. 41, at 26:12–15, No. 2:26-mj-00112-1-CRW]. But by proffer, the United States introduced evidence showing that Mr. Brinkley's stepson, during an interview with law enforcement, had intimated that he had been sexually abused by someone:

> The United States: The interviewer had asked the child if he had been touched on his genitalia. The child disclosed that he had been touched but did not want to further speak about that.
>
> Magistrate Judge Wyrick: And what was the nonverbal?
>
> The United States: Both touching and looking towards his genital area, Your Honor.

[Hr'g Tr., Doc. 42, at 2:6–12, No. 2:26-mj-00112-1-CRW]. Finally, the evidence also showed that a juvenile court had issued a restraining order, which prohibited Mr. Brinkley from having any contact with his stepson. [Hr'g Tr., Doc. 41, at 61:19–23, No. 2:26-mj-00112-1-CRW].

Magistrate Judge Wyrick concluded that the resemblance between the child in the video and Mr. Brinkley's stepson, considered with the search history, added to the seriousness of the potential harm. [Order of Det., Doc. 47, at 11]. The evidence warrants serious concern, but it does not alone establish that the child depicted was Mr. Brinkley's stepson. The stepson did not identify Mr. Brinkley as the person who touched him, and the proffer does not explain the circumstances of that touching. The juvenile court's no-contact order, without more, also does not establish that Mr. Brinkley assaulted his stepson.

The Court does not find on the evidence in this record that Mr. Brinkley sexually assaulted his stepson or produced a video depicting him. But this Court's decision regarding detention does not depend on that finding. The alleged volume and content of Mr. Brinkley's alleged collection of child sexual abuse material and his sustained possession over an extended period of time bear

on the risk of continued dangerousness. Those circumstances, considered with the available conditions of release, provide the principal reason for the Court's assessment of dangerousness.

**5. Availability of Mitigating Conditions**

Lastly, against the backdrop of the Court's analysis of § 3142(g)'s factors, the Court now addresses Mr. Brinkley's argument that his release to his proposed third-party custodian—his mother—would reasonably assure the community's safety. 18 U.S.C. § 3142(c)(1)(B)(i). Magistrate Judge Wyrick determined that Ms. Brinkley, even with the help of her in-laws and Ms. Baumgardner, "would be unlikely to be as diligent as necessary in preventing Defendant's access to the internet or to prevent Defendant from engaging with minor children, including his stepson." [Order of Det., Doc. 41, at 11]. In making this determination, Magistrate Judge Wyrick reasoned that "neither [Ms. Brinkley] nor the others who wrote letters on Defendant's behalf were truly open to believing that Defendant had intentionally viewed the type and volume of CSAM at issue in this case." [*Id.* at 10].

Mr. Brinkley argues that Magistrate Judge Wyrick's "logic" is faulty because it "would require evidence to be produced by the defense of 24/7 third-party supervision of Mr. Brinkley (not something required by statute) and that his family and friends believe in his guilt before they are credible third-party custodians." [Def.'s Mot. to Revoke, Doc. 47, at 19]. Again, under a de novo standard of review, the Court has license "to give fresh consideration" to the record evidence, *Raddatz*, 447 U.S. at 675, and may affirm Magistrate Judge Wyrick's decision of detention on other grounds different from those on which she relied, *see* 28 U.S.C. § 636(b)(1); *cf. Campbell*, 600 F.3d at 677. The relevant issue is whether the custodian can supervise compliance with the imposed restrictions and will report any violations of those conditions.

While conditions of release that require Mr. Brinkley to reside with his mother would likely reasonably assure the safety of his minor stepson, the Court cannot conclude, in light of the United States's clear and convincing evidence of Mr. Brinkley's dangerousness, that they would reasonably assure the community's safety. As an initial matter, the Court notes that Mr. Brinkley allegedly violated § 2252A(a)(5)(B) from the privacy of his own residence, so his proposal that he await trial in a similarly private environment—a large residence, with six bedrooms, in fact—is problematic. *See United States v. Bigham*, No. 2:25-mj-00310, 2025 WL 3214328, at *4 (S.D. Ohio Nov. 18, 2025) ("[The defendant] was able to commit the alleged crimes from the privacy of his home, armed with internet access, and the notion of returning him to a similar environment of privacy is concerning." (citations omitted)). And the fact that Mr. Brinkley will be residing at this large residence alone with his elderly mother is of further concern to the Court, especially when the Court considers the evidence that Mr. Brinkley was able to successfully hide his possession of child pornography from his friends and family for years. *See* [Order of Det., Doc. 41, at 11 (observing that "the evidence appears to show that Defendant has been in possession of CSAM undetected by friends and family"). The Court must assess whether restrictions on devices and access, together with supervision, would reasonably address that risk posed by his release.

In light of this evidence of Mr. Brinkley's ability to deceive his family and friends, the Court has concerns about whether Ms. Brinkley could recognize signs of any further illegal activity. *See United States v. Phelps*, No. 2:20-CR-00074-2-JRG-CRW, 2021 WL 84534, at *4 (E.D. Tenn. Jan. 11, 2021) (ruling that a proposed third-party custodian could not reasonably assure the defendant's appearance at trial partly because she "was unable to identify the signs that Defendant was engaged in this [unlawful] activity"). And although Ms. Baumgardner, Ms.

Bethany Smile, and Ms. Ellen Smile make assurances that they will aid Ms. Brinkley with her custodial duties if necessary, none of them lives at Ms. Brinkley's residence, and while their assurances are admirable, they lack any details or specifics from which the Court can conclude that they will lend effective oversight of Mr. Brinkley's release.

Also, the fact that a cellular hotspot will be active in Ms. Brinkley's residence only enhances the Court's concerns that Mr. Brinkley's release to Ms. Brinkley's custody will not reasonably protect the community. *See United States v. Hoilman*, 2022 WL 17640199, No. 3:22-CR-91-KAC-DCP, 2022 WL 17640199, at *4 (E.D. Tenn. Dec. 13, 2022) ("Where, as here, the Defendant allegedly committed an internet-dependent crime, the ubiquity of the internet—in homes, at work, in stores and establishments, at places of worship, and through *mobile hotspots* on a smart device or phone that can be turned on and off at will—creates a significant obstacle to reasonably assuring the safety of any other person or the community." (citations omitted)); *United States v. Foster*, No. 20-5548, 2020 WL 6791572, at *3 (6th Cir. July 20, 2020) ("'[T]here is simply no failsafe way to prevent any and all exposure,' *even if a defendant forfeits all electronic devices and is denied access to the internet*." (alteration in original) (emphasis added) (quotation omitted))).

And even when the Court focuses less on the general ubiquity of the internet and more on an individualized assessment of the evidence, Ms. Brinkley's plan to wall off the internet from Mr. Brinkley does not strike the Court as one that can reasonably assure the community's safety. Although Ms. Brinkley states that her cellular hotspot will have a "protected passcode" (which all cellular hotspots generally, if not always, have), [Ms. Brinkley Decl., Doc. 14, at 19, 22], the record contains no evidence that her cellphone itself has a protected passcode. If Mr. Brinkley were to gain access to the cellphone, he would have access to the internet. Also,

law enforcement recovered multiple electronic devices from Mr. Brinkley's home, [Hr'g Tr., Doc. 39, at 19:16–18, No. 2:26-mj-00112-1-CRW], so the Court can infer that Mr. Brinkley is technologically adept. Neither of these pieces of evidence—the possible lack of a passcode on Ms. Brinkley's cellphone and Mr. Brinkley's apparent technological savvy—bodes well for the community's safety when the Court views them together or separately.

So for all these reasons, Mr. Brinkley's plan to take up residence in a private home—the very type of setting where he allegedly committed a violation of § 2252A(a)(5)(B)—and to reside there with a continually present source of internet service, which may or may not have adequate protections that will exclude his access, is not a plan that will reasonably assure the community's safety. The United States has therefore demonstrated, by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the community's safety.

## IV. Conclusion

Having conducted a de novo review of the record, the Court concludes that the United States has satisfied its burden of showing by clear and convincing evidence that Mr. Brinkley's release pending trial would pose a danger to the community and "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Mr. Brinkley's Motion for Revocation of Detention Order and Motion for Release under Appropriate Conditions [Doc. 47] is therefore **DENIED**, and Magistrate Judge Wyrick's Order of Detention [Doc. 41] is **AFFIRMED**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge